UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA :
    Plaintiff  :
        :
v.        :   CRIMINAL NO: 04-30031-MAP
        :
KRISTI JARVIS   :
    Defendant :

## DEFENDANT'S SENTENCING MEMORANDUM

Kristi Jarvis, age 22, appeared before Your Honor on March 11, 2005, and pleaded guilty to one count of Using an Interstate Facility in Commission of Murder for Hire.

### Guideline Calculations

The Probation Office has determined that the Adjusted Total Offense Level is 29, (¶37). As Ms. Jarvis has no prior criminal record, the guideline range is 87-108 months. The defendant has no objection to Probation's calculations of the Sentencing Guidelines.

It is now settled law pursuant to *United States v Booker*, No 040104, 2005 WL 50105 (U.S. Jan.12, 2005), that when imposing sentence the Court must consider the Sentencing Guidelines and Policy Statements. In that regard, the Sentencing Commission has provided guidance in determining when there may be factors that mitigate the presumptive guideline range. Jarvis submits that to the extent that her husband's conduct "contributed significantly to provoking the offense behavior, the court may reduce the sentence below the guideline range to reflect the nature and circumstances of the offense." U.S.S.G. §5K2.10. As a

corollary to §5K2.10, another policy statement at § 5K2.12, addresses Jarvis's situation in that her actions are a direct reaction to the duress she suffered attempting to rid herself and her daughter of her husband's abuse. The defendant submits that even if the Court were to impose a strictly guideline sentence, the facts of this case are consistent with the two mitigating factors cited above and would warrant a departure. The facts are discussed infra.

*Booker* requires that in addition to considering the now advisory guideline calculation, the sentencing court is mandated to consider the statutory sentencing factors at 18 U.S.C. §3553(a) among which are (a)(1), the nature and circumstances of the offense and the history and characteristics of the defendant. We start with the defendant's characteristics.

### History and Characteristics of the Defendant

Kristi Jarvis was born in Springfield, MA on November 28, 1982 to a 19-year old mother and 20-year old father who separated shortly after she was born. Although her mother remarried when Kristi was 14 years old, Kristi spent her formative years with no father figure in her life. She and her mother had gone to live with Kristi's maternal grandmother following the breakup of Kristi's parents.

By the time Kristi was 13 years old, she and her mother began to argue. Sometimes the arguments ended in screaming matches. Kristi became sexually active when she was in the sixth grade (age 11). She related to Dr. Prudence Baxter, forensic psychiatrist, that when she was 14 years old, she was raped by two boys who she "thought were her friends." See *Kristi Jarvis Evaluation, pg 3* (Exhibit 1). This event went unnoticed by anyone who might have provided her

2

with guidance. Apparently Kristi did not feel she could confide in her mother and felt she had no other adult to talk to.

The defendant attended Central High School where she and Matthew Moore (victim) began a romantic relationship. When the couple were both 18 years old, Kristi became pregnant with their first child, Mia, presently age 5. Kristi did not finish high school although she was given the opportunity to attend an alternative high school. She related that she wasn't the best student and didn't think she needed school. She moved out of her mother's home and the couple took up residence with Kristi's father. She relates that shortly after the relationship began, Matthew started "behaving in a very jealous and controlling manner." Over time, the jealousy progressed from Matthew being manipulative and controlling to becoming emotionally abusive. By the second year of the relationship, she recounts that he became physically as well as verbally abusive. In spite of these problems, the couple had two more children, and formalized the relationship in marriage in August 2003. After they married, the couple moved into their own apartment on Layzon Brothers Road in Indian Orchard. Jarvis reports that she started fighting back in 2004, but that her actions only made matters worse.

According to a Report of a Guardian Ad Litem (Exhibit 2) that was ordered as result of the instant offense, a 51A report was filed as early as November 2000 alleging that Matthew was physically abusing Mia, then 9 months old. After an assessment the case was closed but again followed by another 51A report in December 2003 for Matthews continued abuse of Mia. Yet a third 51A was filed in February 2004 for his further physical abuse and neglect of Mia. "Between

January 2003 and December 2003 there were six police responses to the Moore household based on domestic violence or Mr. Moore refusing to leave the home." *Id.*    As is often the case with restraining orders, the defendant never followed through, either vacating the order or allowing the order to lapse.

In spite of her difficulties raising three children and maneuvering life with an abusive husband, Kristi attempted to get an education and a skill that she could use to help support her family. She obtained a General Equivalence Diploma in 2001 and began a nine-month medical assistant course at the Salter School.  At the time, Kristi and Matthew were living with Kristi's stepmother, Ann Jarvis.  In a letter to the Court (Exhibit 3(a)), Ann Jarvis recounts hearing an argument between the couple regarding Kristi's going to work.  Kristi had "a job at Louis and Clark Pharmacy at Mercy Hospital and she was going back to school to become a Nursing Assistant...He was telling her to call in sick and that he wasn't going to drive her either...I heard her say 'stop cutting my clothes' and telling him to just leave...Finally...he left with their only car...I gave her a ride to work...she told me how he had put slit marks in most of her new work clothes." Ann Jarvis recounted how she wanted Matthew to leave the house and she said Kristi and the children could live with her.  But by that same evening, Kristi was cooking a meal for him.  Kristi lasted only two months at the Nursing Assistant program.

The defendant tried again to gain a marketable skill in 2003 when she enrolled in a nine-month program at the Ultrasound Diagnostic Center.  But Matthew again put obstacles in her way by refusing to watch the children and by harassing her.  The pre-sentence report shows Jarvis's employment history as a

˒ series of fits and starts. Her lack of extended employment is a direct reflection of Matthew's efforts at subversion. Even while Jarvis was on pre-trial release, she worked at the Family Dollar store until September 2004 (PSR ¶63). Significantly, Jarvis resumed her relationship with Matthew in September 2004 (PSR ¶54) and stopped working. This reunion ultimately led to her pre-trial detention for violation of release orders.

Jarvis has finally found the strength while incarcerated and receiving counseling, to refuse visits from Matthew and to file for divorce. Matthew continues his efforts to control Jarvis by writing her (See Letters, Exhibit 4) and attempting to gain custody of the children. Jarvis plans to relocate with her mother and children to Florida whenever she is free to do so.

### Nature and Circumstances of the Offense

As outlined above, the seeds of this offense were planted when the 18-year old Ms. Jarvis became pregnant with Mia, thereby solidifying her relationship with Matthew Moore. Although signs of his abusive tendencies began to emerge early on -- "Matthew started being jealous a few months after they started dating" (*Id. Baxter*, Exhibit 1, pg 5*)* -- Jarvis was too immature to recognize them. "'Before I was pregnant he was kinda controlling. He didn't want me dressed in a certain way -- in skirts, fitted shirts or sweaters -- unless I was with him. I stopped talking with my best friend…She'd badmouth him and he heard and didn't want me seeing her if she was badmouthing him.' Jarvis indicated that he also began to control what she did with her money, questioning her about what she was doing with it. He called her names -- 'slut, bitch, whore.'" *Id.*

The American Judges Foundation (AJA) has been studying Domestic Violence for thirty years. (See *"Domestic Violence & The Courtroom"*, Exhibit 5). The AJA experts provide a collection of psychological symptoms that amount to what is known as "Battered Woman Syndrome." (Exhibit 5(A)). Some forms of emotional battering described by the AJA were systematically employed by Matthew against Ms. Jarvis. For example, the "Insults" described in the preceding paragraph served to undermine Jarvis's self-confidence and "eventually render the victim [Jarvis] emotionally incapacitated." (AJA, *"Forms of Emotional Battering"* *"Insults ,* (Exhibit 5(B). He used "Possessive and Punitive Behavior" as described above by limiting Jarvis's freedom through his jealousy and creating isolation. Jarvis stopped talking to her friends. (*Id." Possessive and Punitive Behavior")*

Once Matthew had control over Jarvis's emotional life, he escalated his control. When Jarvis became pregnant with her second child, Matthew began staying out with his friends and taking up with other women. Matthew flaunted the other women, thereby successfully using Jarvis's insecurity to "Emotionally Blackmail" Jarvis into total control. (*id. "Emotional Blackmail")* "Ms. Jarvis explained that she wanted to break up with him because he was so often with other women and because he was violent to both her and the children. However, after a separation that she said never lasted more than a week, Matthew would phone her and apologize. 'I really thought he wanted to change.'" (*Op cit. Baxter*, Exhibit 1, pg 7) First Moore would take advantage of Kristi's insecurity by playing on her own jealousy; then he would lock in control of her by apologizing, renouncing the other women and saying he has changed.

By the time Jarvis made contact with the CW, who seemed willing to kill her husband for a mere $3000, Jarvis had already undergone five years of abuse at the hands of Matthew Moore. Over the five-year period, the abuse had escalated from verbal and emotional abuse to physical abuse of both Jarvis and their eldest child, Mia. There is ample evidence of this abuse, both from photos of Ms. Jarvis's bruises taken by the police (Attached, Exhibit 6) as well as direct testimony of those who observed the abuse of Mia. (See Letters *Robert Quinn, Kim March, Ann Jarvis, Guardian Ad Litem Report* Exhibits 3 and 2 respectively). See U.S. v. Morin, 80 F.3d 124 (4th Cir. 1996) wherein a defendant decided to hire a hit man to kill the husband and was convicted of murder-for-hire. The Fourth Circuit reversed a downward departure under § 5K2.10 based on the victim's alleged misconduct, holding that the guideline requires that the victim actually have done something wrong. The only evidence that the victim did anything wrong in that case was defendant's recollection of a statement by the wife. This case is easily distinguished from *Morin,* since there can be no doubt that Matthew Moore abused Jarvis and Mia both physically and mentally over a long period of time.

See also *U.S. v. Whitetail,* 956 F.2d 857 (8th Cir. 1992). Defendant therein was convicted of the second degree murder of her long-time, live-in boyfriend. At trial, she claimed she was suffering from battered woman syndrome and that she stabbed her boyfriend in self-defense. The district court refused to depart downward under guideline section 5K2.10 based upon the battered woman syndrome, ruling that by finding defendant guilty, the jury rejected defendant's claim of battered woman syndrome. The 8th Circuit ruled that the jury's rejection

7

of defendant's self-defense claim did not preclude a downward departure based upon the battered woman syndrome. Defendant submitted evidence of battered woman syndrome, not as a defense in itself, but as the primary component of her claim of self-defense. If her claim of self-defense had been accepted by the jury, she would have been acquitted. Thus, to the extent that section 5K2.10 permits consideration of battered woman syndrome as a basis for departure, it does not require proof of the same elements necessary to establish a claim of self-defense at trial. Ms. Jarvis never denied she tried to hire someone to murder her husband. She acted in a fit of desperation brought on by the fact that she and her daughter were victimized by her husband for many years.

In _U.S. v. Ramos-Oseguera_, 120 F.3d 1028 (9th Cir. 1997) the district court departed downward by two levels for youthful lack of guidance based on abuse that defendant suffered at the hands of her co-conspirator husband. The court said "lack of youthful guidance, duress, whatever you want to call it, battered woman's syndrome, is the same thing." On appeal, the Ninth Circuit noted that at the time of sentencing, the departure for youthful lack of guidance was proper. But it was unclear that the district court recognized that departures for imperfect duress and diminished capacity are separate and distinct, even if based on the same facts. Accordingly, the case was remanded for "findings on imperfect duress and diminished capacity as it relates to the battered woman syndrome" and for the court to "exercise its discretion to depart on these two additional grounds if the facts of defendant's case warrant it."

Based on the facts of the instant offense, it is clear that Ms. Jarvis's attempt to hire someone to kill her husband came at a time of heightened

emotional abuse. Her attempt was not the planned, well-thought-out scheme of someone who is thinking rationally. Dr. Baxter opines:

> It does not appear...that when she spoke with this individual she did so with the intention of soliciting his help in killing her husband. Rather, she wanted someone to listen to her to whom she could unload how bad she was feeling. When the conversation evolved...to Ms. Jarvis' discussing this man killing Matthew Moore, it was likely with the same lack of thinking through what she was doing that characterized other important decisions she had made in her life. This impulsive desperation was fueled by her depression and inability to think through more mature – or acceptable – options for dealing with what felt like and impossible situation. *Id. Baxter,* Exhibit 1, pg 10.

Ms. Jarvis admits she "snapped" after Moore's girlfriend left a message on her answering machine. 'She wanted me to call her. She said [Matthew] wants to have a baby with her. She thinks she's pregnant.'" (*Id. Baxter,* Exhibit 1, pg 9). Matthew Moore had systematically used every tool in the abuser's book to maintain control over Jarvis. One of his biggest tools was Jarvis's emotional insecurity and immaturity. To this day, he continues to attempt to control her.

Since her incarceration in November 2004, Moore has attempted to visit Jarvis and has written her numerous letters telling her that he wants to reunite with her; he loves her. Yet he taunts her with "how do you feel not knowing where I'm at and what I'm doing." He accuses her of lying to him. And he claims he won't write again. (See *Moore* Letter 11/8/04, Exhibit 4(A). But again he writes to her a month later, professing his love for her, admitting he did things

9

wrong, admitting he had other women, but telling her that she is the most important thing in his life. He thinks if they get out of here they can start anew and everything will be fine. He regrets everything he did to hurt her. He ends by talking about another baby because he thinks she's pregnant. (Letter *Moore* 12/9/04, Exhibit 4(B). He writes again after trying to visit her and being sent away. This time he tells her that the girlfriend is pregnant, and he tries to manipulate Jarvis into telling the girlfriend she [Jarvis] is pregnant, thereby convincing the girlfriend to have an abortion. This is only if everything between Moore and Jarvis "is okay." He tells her of another girlfriend and the two girlfriends fighting over him. He'll leave both of them if Jarvis will take him back. (Letter *Moore* 12/12/04, Exhibit 4(C). Finally, even after she has refused his visit, he writes to her on Dec. 21, 2004 and tells her that he should be her number one priority. Then he tells her that Ariane (one of the two girlfriends) still loves him, but he still loves Jarvis. (Letter *Moore* 12/21/04, Exhibit 4(D).

It is clear that Moore is having a hard time letting go of his need to control Jarvis. The letters demonstrate an emotionally damaged person who has not learned to how to have a mature relationship with a woman. Without getting into Moore's background, it appears that he has learned nothing and would, himself, benefit from therapy.

### Meeting the Purposes of this Sentence

The Court must impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in the statute at 18 U.S.C. §3553(a)(2) i.e., (A) to reflect the seriousness of the offense, to promote respect

for the law, and to provide just punishment for the offense. (B) to afford adequate deterrence to criminal conduct. (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner. Clearly, Ms. Jarvis's offense is a serious one that deserves a sentence that does not minimize the gravity of the act. Nonetheless, a just punishment for the offense need not comply with the advisory guideline range in order to meet the purpose. The Court may also consider the mitigating factors described above and fashion a sentence that addresses those factors as well as the seriousness of the offense.

Ms. Jarvis cannot be said to be a danger to the public. She has no criminal record and no inclination to violence or antisocial behavior. If she is afforded proper counseling and treatment, she could well become a productive member of society, working to support herself and her children. She has shown motivation to gain a marketable skill and only needs the opportunity, without her husband abusing her, to fulfill her goals.

Her children are being disadvantaged by her absence. Although Ms. Jarvis's mother has been granted custody, there can be no proper substitute for the children's own mother who obviously cares a great deal for them. Inasmuch as they have undoubtedly been traumatized by their father's behavior toward themselves and their mother, it would be beneficial for them to have some formative years with their mother in a stable environment. Ms. Jarvis plans to move to Florida with her mother and children as soon as she can. Clearly, if she were to receive counseling and vocational training and live some distance from

Mr. Moore, she would have a chance at starting a life free from the encumbrance of an abusive husband.

It is urged upon the Court that a jail sentence of reasonably short duration considerably less than eight years followed by a term of supervised release with conditions that require Ms. Jarvis to undergo counseling and job training results in a "just punishment" that meets all of the sentencing purposes set forth in the statute and is a disposition that reflects full consideration of guideline factors including permissible grounds for departure.

Respectfully submitted,
The Defendant, Kristi Jarvis
By Her Attorney

Michael O. Jennings, Esq.
73 Chestnut Street
Springfield, MA  01103
(413) 737-7349
(413) 731-1302-fax
BBO# 251340

## CERTIFICATE OF SERVICE

I, Michael O. Jennings, hereby certify that I served a copy of the foregoing document on the government by mailing same, postage prepaid to Paul Smith, Assistant U. S. Attorney at the U.S. Attorney's Office, 1550 Main Street, Springfield, MA  01103 on August 9, 2005.

Michael O. Jennings, Esq.

12